PUAILOA TAVETE, Plaintiff

v.

Estate of LAGAFUAINA LAISENE,
FA'AOPOOPO LAGAFUAINA, Executrix;
HUGO GEBAUER; MARCUS LANGKILDE, personally
and as Executor of the Estate of MARIE LANGKILDE;
LEFAGA BEAVER; SMITH HO CHING; TELE'A PULETASI;
FALENOFOA STEFFANY; ROBERT C. PAYES;
ROY J.D. HALL, Jr.; TUI MARCUS;
and SOLA PENEI SEWELL, Defendants

High Court of American Samoa
Land and Titles Division

LT No. 18-87

May 30, 1989

Before REES, Associate Justice, OLO, Associate Judge, and AFUOLA, Associate Judge.

Counsel: For Plaintiff, Charles Ala'ilima
For Defendants Lagafuaina, Payes, and Sewell, Albert Mailo
For Defendants Gebauer, Ho Ching, Marcus, Puletasi, and Steffany, Edwin Gurr
For Defendant Langkilde, William Reardon
For Defendant Beaver, Aviata F. Fa'alevao

This case concerns about sixty acres of a tract called Malaeimi near the village of Faleniu.

## I. Facts

Malaeimi has had an eventful legal history during the hundred years that there have been courts in Samoa. Indeed, the facts of this case consist largely of the results of various legal proceedings.

1) In 1895 an entity called W. McArthur & Co. attempted to register a mortgage with the Samoan Land Commission in Apia. The mortgage was given by one Sa Manoa over nine acres called "Malaeaimi," said to be in the village of Faleniu. Fanene of Nu'uuli objected, claiming to be the rightful owner of Malaeaimi. The land commission registered the

mortgage, but this decision was reversed by the Supreme Court of Samoa. The official record of the decision does not show that the Court declared anyone to be the owner of Malaeaimi or Malaeimi, but only that the claim of W. McArthur & Co. was rejected. W. McArthur & Co. v. Fanene, Claim No. 2215, Supreme Court of Samoa (on rehearing, Dec. 19, 1895).

2) In 1905 several persons, all but one of whom appear to have been matais of the village of Pago Pago, attempted to lease the entire Malaeimi Valley and the surrounding mountainsides to the Church of Jesus Christ of Latter Day Saints (hereinafter the Church). The tract in question occupied a substantial portion of central Tutuila; it comprised about 905 acres extending from Faleniu to Fagasa and from Asu to Nu'uuli. Objection was made by people from all of these villages, including Puailoa Vaiuli of Nu'uuli, and the lease was not approved by the Governor.

3) In 1906 Puailoa Vaiuli executed a lease to the Church of 360 acres within Malaeimi for a term of forty years.

4) In 1908 Alo Taisi brought an action against Puailoa Vaiuli in the High Court of American Samoa, which had by then replaced the Apia tribunal as the appropriate forum for such actions. Alo was a chief of Fagasa; he claimed that he owned part of the 360 acres that had been leased to the Church, and he demanded part of the rentals. The court ruled for Puailoa. The court found that Malaeimi "ha[d] been unimproved property during the memory of any living man up to the year 1900." Alo v. Puailoa, 1 A.S.R. 194, 195 (1909). Puailoa had, however, appointed caretakers, gathered lumber for the building of houses in Faleniu, and done other acts amounting to assertion of ownership. Moreover, the court found that Puailoa had assisted Fanene in the successful resistance of McArthur's claim before the Apia court, and it was "the opinion of the Court that, were it not for the vigilance of Puailoa and Fanene in resisting the [McArthur] claim . . . , the entire property known as Malaeimi . . . would have passed out of the control of native Samoans." Id. at 196-97. Puailoa was therefore declared the owner of Malaeimi, or more precisely of "all Malaeimi not controlled by Fanene." Id. at 195.

5) Puailoa Vaiuli received the rents from the Church until his death in 1929. After his death the rents were paid to his widow, Salataima.

6) In or around 1931, some matais of the Puailoa family demanded from Church officials that the rents for the 360 acres be paid to them rather than to Salataima, apparently on the ground that Malaeimi had not belonged to Puailoa Vaiuli as an individual but was communal land of the Puailoa family. A Church official asked the Chief Justice of the High Court what he should do. The Chief Justice told the official to pay the rents into court pending a resolution of the dispute between Salataima and the Puailoa chiefs. Instead the Church withheld the rental payments pending a resolution of the dispute.

7) As it happened, there was at that time (1931) a case involving the Puailoa family on the court's calendar. This was a case involving the succession to the Puailoa matai title. According to the Chief Justice, he moved the case forward on the calendar, putting it ahead of many cases that had been filed earlier, so that the land dispute could be resolved in the same proceeding. Chief Justice E.P. Wood to Gov. G.S. Lincoln, 11/30/1931 (Nouata v. Pasene, LT No. 18-1930, 1978 Motion to Reopen, Puailoa Exhibit 19).

8) At the hearing of the matai title case, the Chief Justice questioned all the principal witnesses concerning whether Malaeimi was individual or communal land. Their testimony was as follows:

a) Fanene testified that the Puailoa title was a lesser title within the Fanene grouping and held no lands, but that Puailoa Vaiuli had owned some lands in his individual capacity.

b) Nouata, a contestant for the Puailoa title, testified that Vaiuli had held Malaeimi not in his own right but as Puailoa family land.

c) Salataima, the widow of Vaiuli, testified that Malaeimi had belonged not to the Puailoa family but to her husband personally "because if he had not been there [in Apia during the McArthur case] the land

57

would have gone forever." She testified that Vaiuli had always used the rental payments for himself and herself, not for the expenses of the Puailoa family; that no member of the Puailoa family had ever questioned this practice; that Vaiuli had made a will giving her the pule over the land; and that Vaiuli had won the land in the Apia case before he acquired the Puailoa title.

Nouata v. Pasene, LT No. 18-1930 (Transcript of trial held June 9, 1931).

9) The Court ruled that Nouata was entitled to hold the Puailoa title. With regard to the property, the Court held that

> that part of Malaeimi that is leased to the Mormon Missionaries is the property of the widow of Puailoa and that she should have during her lifetime the rents.

Nouata, supra (Judgment, rendered June 9, 1931) (emphasis added). The Court also made a "suggestion" to the widow Salataima:

> While she is living it is suggested that she shall make a written statement signed by two witnesses, who she wants this money to go to after her death. It is only a suggestion but it might be a good idea for her to give it to the Puailoa family after she dies.

Id. (emphasis added).

10) The newly-designated Puailoa Nouata, along with various other family members and chiefs of Nu'uuli, then attempted to secure a reversal of the Court's decision that Salataima was the owner of Malaeimi.

> a) First Nouata went to discuss the decision with Chief Justice Wood. As Nouata later described this encounter in a letter to the Governor, "[t]he Judge chased me away from the office. Nothing could be done, as a decision of the case." Letter from Puailoa et

58

al. to Gov. G.S. Lincoln (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 6).[1]

b) Nouata and his co-signers therefore urged the Governor himself to overrule the Court decision. Letter from Puailoa to Lincoln, supra. Among other reasons for such an action, they urged (1) that the Court had been without jurisdiction to dispose of the land, since the case was a matai title case and "there was not a case tried between Salataima and Puailoa about the Land called Maleaimi [sic]"; (2) that the Court had been wrong on the merits, since Puailoa Vaiuli had acquired Malaeimi for the Puailoa family rather than in his individual capacity as Vaiuli; and (3) that the land had been taken away as a result of a conspiracy including Salataima, the Chief Justice, the Attorney General, and Nouata's own counsel at trial, a chief of Nu'uuli named Soliai. Id.

c) The Governor then wrote to the Chief Justice asking for information about the case. Lincoln to Wood, 10/21/31 (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 9).

d) The Chief Justice responded with suggestions for the best procedural means by which to arrange for a rehearing of the property issue if the Governor wished a rehearing. Wood to Lincoln, 10/24/31 (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 12).

e) The Governor announced, however, that there would be no rehearing, because "the case was tried in open court and all parties were given full opportunity to be heard. . . . [and] appears to me to be in accordance with the testimony." Lincoln to Soosimea et al., 10/24/31 (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 10).

f) The matais then wrote again to the Governor, enclosing a copy of a letter they had written to United States Senator Hiram Bingham to complain about the decision, both

---

[1] We take judicial notice of the record of the proceedings in Nouata and in the other cases concerning Malaeimi that are cited in the text.

on the merits and because they had been unfairly surprised by the injection of the property issue into the matai title case. Puailoa et al. to Lincoln, 11/18/31 (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 15).

g) The Governor forwarded this letter to the Chief Justice, noting the complaint that "the property was not referred to in the summons, and testimony as to the property not presented, nor fully investigated." Lincoln to Wood, 11/27/31 (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 18).

h) The Chief Justice responded at length, saying that Nouata had been "primarily" a matai title case but had been advanced for trial specifically in order to ascertain who should be paid the rents for Malaeimi; that the decision "affected only a part of the land Malaeimi"; that no summons are issued in matai or land cases; that "[f]ull testimony as to the ownership of the property concerning which a decision was made in this case was taken at the trial"; and that all of the signers of the letter protesting the decision had been present in court and had had an opportunity to be heard. Wood to Lincoln, 11/30/31 (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 19).

i) Finally, the Governor wrote back to Puailoa and the other matais, quoting the Chief Justice's letter and reiterating that the case would not be reopened. Lincoln to Puailoa et al., 11/30/31 (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 20).

11) It was clearly understood by all parties to the Nouata case that Salataima was not a member of the Puailoa family and that, having no children by her deceased husband, she had according to Samoan custom no right to remain on communal land of the family. See, e.g., Nouata v. Pasene, LT No. 18-1930 (Transcript of trial held June 9, 1931) (testimony of Salataima); Puailoa et al. to Wood, 11/18/1931 (Nouata, 1978 Motion to Reopen, Puailoa Exhibit 15). This fact was reiterated by Puailoa Tavete in sworn testimony in 1982: "She doesn't have any right. She does not have any connection and she doesn't have any children." Reid v. Puailoa, LT No. 41-79 (Transcript of trial held

60

March 5, 1982), at 341. It is also consistent with the universal understanding of Samoan custom regarding the status of widows. See Tuiteleleapaga v. King, 8 A.S.R.2d 49, 50 (1988).

12) About a year later, in a case to which neither Salataima nor Puailoa was a party, Chief Justice Wood wrote in dictum that the part of Malaeimi "on the right side of the road is the land of the name Puailoa" and that "the rental of this land is received by Salataima, the widow of Puailoa Vaiuli"; and that the part of the land not rented to the Church "is under the pule of the Present Puailoa, Puailoa Nouata." Tu'utau v. Fanene, No. 1-1931 (Decision rendered October 13, 1932). The land at issue in Tu'utau was not the 360 acres leased to the Church, but some land on the other side of the road that was held to be the property of Fanene. During the trial various witnesses including Salataima and Puailoa Nouata had testified about whether Puailoa Vaiuli's claim to part of Malaeimi had been in his own right or on behalf of the family. Tu'utau, supra (Transcript of trial held October 7, 1932). The Court's statements about the ownership of the part of Malaeimi that had been leased to the Church, however, were obiter dicta rather than part of the holding.

13) In 1942 Salataima wrote a will reciting her ownership of the 360 acres and bequeathing the land to her brother, Lagafuaina Laisene.

14) In 1944 Salataima renewed the lease to the Church for another forty years. The lease specified that upon the death of Salataima the rents ($360 and two cows per annum) were to be paid to Lagafuaina.

15) In 1953 Salataima sold the Church 300 of the 360 leased acres. She retained the remaining sixty acres, which are the subject of the present case.

16) A few years after the sale of the 300 acres, then-Chief Justice Morrow wrote that the sale did not need to be approved by the Land Commission because "it conveyed land individually owned by a Samoan" rather than communal land. In re Airport at Tafuna, CA No. 15-1959, Opinion rendered December 28, 1959, at 19. Since this case did not directly concern the land in question

(the sale to the Church being relevant only to the question of fair market value of land in the vicinity) Chief Justice Morrow's characterization of Malaeimi was dictum rather than holding.

17) Salataima died in 1956, leaving to her brother Lagafuaina the sixty acres of Malaeimi that she had not sold to the Church.

18) The weight of the evidence in the present case is that the sixty acres were occupied and cultivated by Salataima and Lagafuaina, apparently by consent of the Church, even during the time it was leased. In any case it is clear that Salataima and Lagafuaina were in possession of the sixty acres from the time the other 300 acres were sold to the Church in 1953, and that Lagafuaina and his family (together with their various lessees and vendees) remained in sole possession until about 1979.

19) Beginning in the late 1950s Lagafuaina leased and sold portions of the sixty acres. Such transactions included sales to Smith Ho Ching in 1959, to Lefaga Beaver in 1963, 1968, and 1971, to Epifania Felise in 1964, to Marie Langkilde in 1968, to Hugo Gebauer in 1971, and to Tui Marcus in 1975. Leases included those to South of Pago Pago, Inc., in 1968 and 1973, to Air New Zealand Ltd. in 1968, to Burns Philp (South Sea) Co. in 1969, to John Pyke in 1973, and to Mr. and Mrs. Robert Payes in 1975. Some of these transactions were recorded in the office of the Territorial Registrar, and at least two (leases to Burns Philp and to Mr. and Mrs. Robert Payes) were approved by the Land Commission.

20) Lagafuaina built at least one dwelling house on the land and his granddaughter, Sola Sewell, built another. Many of the vendees and lessees also built houses and other improvements. There are at least fifteen structures on the sixty acres, including some large as well as some smaller homes, stores, a warehouse, and a private school complex that was formerly operated as a hotel. Although, in light of our conclusions regarding the law, it is unnecessary for us to place a precise value on each of these improvements, the total value of all improvements would appear to exceed a million dollars.

62

21) Although the daughter and son-in-law of the current holder of the Puailoa title, Puailoa Tavete, testified that the Puailoa family also used parts of the sixty acres at various times between 1953 and the present, there is no convincing evidence of such activity prior to about 1979 when Siufaga Fanene, the son-in-law of Puailoa Tavete, apparently began some cultivations on parts of this land as well as on the land then in the possession of the Church. The evidence suggests that this activity was part of a strategy to recapture for the Puailoa family the land that had been lost to Salataima in 1931.

22) In 1975 Lagafuaina Laisene died. He left a will leaving, inter alia, certain land within the sixty acres to his daughter. Puailoa Tavete filed an objection, asserting that the land belonged to the Puailoa family. This was the first formal indication since 1931 (or at the latest 1932, when Puailoa Nouata testified in the Tu'utau case that all of Malaeimi belonged to the Puailoa family) that the Puailoa family claimed the sixty acres or any part of it. Counsel for the executrix asked that the objection be dismissed on the ground that Puailoa had failed to object in 1970 when Lagafuaina had registered, with the various forms of notice required by statute, a separation agreement for this portion of the land. After a hearing, the objection was "withdrawn and dismissed." In re Estate of Lagafuaina Laisene, PR No. 5-75 (Order issued December 4, 1975). The Estate is still in probate, partly as a result of the pendency of the present litigation in which it is the principal defendant.

23) In 1978 Puailoa Tavete filed with the High Court a motion for a new trial in the 1931 Nouata case. In the alternative the motion asked that the forty-seven-year-old judgment be set aside. The Court denied the motion, primarily on the grounds that (1) the Governor, who was then entitled to sit as President of the High Court, had already rejected such a motion shortly after the decision in 1931; and (2) in any case, forty-seven years was too long to wait before moving for relief from a judgment. Nouata v. Pasene, LT 18-1930 (Order Denying Motion for New Trial and for Relief from Judgment, issued February 20, 1979).

24) The trial court judgment denying the motion for relief from the Nouata judgment was

63

upheld on appeal. In an opinion written by Acting
Associate Justice Kennedy (now Justice Kennedy of
the United States Supreme Court) the Appellate
Division held that the 1931 decision was not void
for want of jurisdiction:

> [T]he predecessor in interest of the
> party making this motion [i.e., Puailoa
> Nouata, predecessor of Puailoa Tavete]
> submitted himself to the jurisdiction of
> the trial court in the 1931 litigation
> and therefore had sufficient notice of
> the pendency of the suit. The only way,
> then, that the irregularity allegedly
> committed by the 1931 court in making a
> determination concerning the status of
> the land can be grounds for finding the
> judgment void is if the determination was
> so remote from the subject matter of the
> litigation that the court could not
> adjudicate the two matters
> simultaneously.
>
> . . . .
>
> [I]t was apparently understood by all
> parties that the status of the land
> Malaeimi, whether personally belonging to
> Salataima or whether communal, was in
> dispute as well as who could lawfully
> claim the _matai_ title Puailoa . . . .
> [T]he two matters were inextricably
> intertwined, and . . . [Puailoa Nouata],
> who was apparently the party adversely
> affected by any determination of the
> status of the land Malaeimi, was
> reasonably and actually notified that the
> two matters would be jointly resolved.

Nouata v. Pasene, AP No. 7-79, 1 A.S.R.2d 25, 31,
32-33 (1980). The appellate court also held that
no other basis for relief from the judgment had
been presented. Id. at 35.

25) After disposing of the motion, the 1980
appellate court added: "We intimate no views as to
the interpretation of the 1931 decision or its
bearing on the ultimate question of title, only
that it is valid as to these parties [i.e.,
Puailoa, the Estate of Lagafuaina, the Government,
and the Church]." Id. at 35. This may have been a
reference to an issue that later became very

important: whether the question of who was entitled to the rentals was somehow separate from the question of who owned the land. It can also be read, however, as a caveat to the effect that the 1931 decision was binding only on the parties to the case, namely Puailoa, Salataima, and Fanene, and their successors in interest; as in most cases, the "ultimate question of title" could still be litigated by anyone who had not already had his day in court.

26) The question of who owned the 300 acres was relitigated yet again in Reid v. Puailoa, LT No. 41-79. In this case the plaintiff was the Church, which alleged that in May 1979 (about three months after the denial of the Motion for New Trial in Nouata) Puailoa Tavete and members of his family had begun planting crops on portions of the 300 acres of Malaeimi belonging the Church. The decision in the case was rendered three years later, by the same trial judge (Chief Justice Miyamoto) who had denied the motion for new trial in Nouata. This time Puailoa won: the Court held that Malaeimi was the communal land of the Puailoa family, having been recognized as such in the 1909 Alo case; that it therefore could not legally have been alienated without the observance of certain statutory prerequisites; and that "the 1931 Nouata opinion only gave to Salataima the rentals from the Church lease." Reid v. Fanene & Puailoa, LT Nos. 7-79 & 41-79 (Decision and Order issued April 19, 1982).

27) The trial court decision in Reid also declared that the sixty acres which Salataima had left to her brother Lagafuaina

--- the sixty acres involved in the present case--- had always been and were still the communal property of the Puailoa family. Neither the Estate of Lagafuaina Laisene nor any of the other defendants in the present litigation, however, had been parties to the case. After the decision the Estate attempted to intervene, as a necessary party to any decision with regard to the sixty acres, but the trial court never ruled on the motion.

28) In 1983 Reid v. Puailoa was upheld on appeal. The Appellate Division treated the trial court's determination that the land was communal--- including its interpretation of the 1909 and 1931 opinions --- as a finding of fact. As such, it

should be upheld if "supported by the evidence."
Reid v. Puailoa, AP No. 14-82, Opinion rendered
March 30, 1983, at 7. (This portion of the opinion
was omitted from the reported opinion at 1 A.S.R.2d
85.) "On appeal, Appellant's burden is to show
that the decision of the trial court was clearly
erroneous . . . . " Id., slip opinion at 7. Since
the trial court's finding that "the language of the
1931 decision [was] ambiguous," and its consequent
construction of that decision as granting only a
life interest in rental payments, were not "clearly
erroneous," they were upheld. Id. at 8, 10.

29) The appeals court then rejected the
contention that the Church might have acquired the
300 acres by adverse possession. Since the Church
had acquired the land from Salataima in 1953, and
since "a family member cannot adversely posess
[sic] communal land, there could be no tacking and
the operation of law could vest title in the less
than thirty years" between 1953 and 1978. Id.,
slip opinion at 12, 1 A.S.R.2d 85 at 88. The Court
added in dictum that communal land may not in any
case be acquired by adverse possession. Id. at 12
n.1, 1 A.S.R.2d at 88 n.1.

30) The Church later made a motion for relief
from judgment, presenting evidence from the records
of the Legislative Reference Bureau to the effect
that the applicable adverse possession period was
twenty years, not thirty years. The same appellate
panel then held (1) that the legislature never
intended to "permit Samoan land to be taken by
foreign corporations by adverse possession"; and
(2) that in any case the record reflected "actual
physical presence on the land in question [the 300
Church acres]" by the Puailoas from which "the
trial court could easily have concluded that the
occupancy of the Church was never exclusive, an
essential element of adverse possession." Reid v.
Puailoa, AP No. 14-82 (Order issued December 11,
1984) at 6, 7.

31) The Appellate Division reversed that
portion of the trial court decision that had
purported to award to the Puailoa family the sixty
acres involved in the present case. This was
because the trial court had no jurisdiction to
"terminat[e] the property rights of several
individuals without their knowledge and without
granting them an opportunity to defend their
interests." Reid, supra, 1 A.S.R.2d at 89.

66

"Elementary concepts of due process" dictate that "[o]ne is not bound by a judgment" resulting from litigation in which one has not had notice and an opportunity to be heard. Id. The individuals to whom this portion of the appellate decision refers ultimately became the defendants in the present case.

32) Although neither Puailoa nor any other party to Reid had attempted to bring any of the present defendants into that case, during the early 1980s some members of the Puailoa family, including Puailoa Tavete, told some of those who had purchased property from Lagafuaina that they were residing on Puailoa land. Among those who received such communications were Marcus Langkilde, Tui Marcus, and perhaps others among the defendants to the present litigation.

33) In 1983 Puailoa Tavete filed the present action. It was erroneously filed in the Trial Division rather than the Land and Titles Division; the named defendants were the Estate of Lagafuaina Laisene, the executrix of the Estate, and "Does I thru X."

34) In 1987 the action was transferred to the Land and Titles Division and the complaint was amended to name the various purchasers and lessees from Lagafuaina in place of "Does I thru X."

## II. The Effect of Nouata v. Pasene

At the outset, we observe that our decision in this case is constrained by the 1931 decision in the case of Nouata v. Pasene. That decision--- alone among the various opinions that have touched in one way or another upon Malaeimi or the Puailoa family --- has the effect of res judicata in a case concerning the sixty acres presently in dispute, and having as parties the respective successors in interest of Salataima and of Puailoa Nouata.

For the reasons stated in the 1980 decision of the Appellate Division refusing to reopen the case, the Court had jurisdiction over the subject matter; although the way in which this jurisdiction was exercised was informal compared to current High Court procedures, the losing party had such notice and opportunity to be heard as afforded due process of law. See Nouata v. Pasene, AP No. 7-79, 1 A.S.R.2d 25, 31, 32-33 (1980), summarized in

paragraph 24 of Part I, supra. The 360 acres involved in Nouata clearly included the sixty acres involved in the present case, and the holding of Nouata adjudicated the rights of the Puailoa matai against Salataima. Whether or not we approve of or agree with the holding in Nouata, we are absolutely bound by it.

There remains the question what exactly the holding of Nouata was. The necessity of discussing this question at some length is occasioned more by various similar discussions that have taken place between 1931 and 1989 than by anything in the language or context of the decision itself. On its face the decision holds the 360 acres to be "the property of the widow of Puailoa." Nouata, supra (Judgment rendered June 9, 1931), discussed in paragraph 9 of Part I, supra. Unless the Court can be shown not to have meant what it said in 1931, then the successors in interest of Puailoa Nouata are forever bound --- and this Court is accordingly bound in the present case --- to treat the land presently in dispute as "the property of" Salataima and her successors. Thus there must be judgment for the defendants.

It is suggested, however, that the 1931 Nouata decision did not really adjudicate the question of who owned the 360 acres. Indeed, this suggestion formed the basis of the trial court's opinion in Reid v. Puailoa, supra. Because neither the land presently in dispute nor any of the present defendants or their ancestors in title were before the Court in Reid, the decision in that case would not appear to bind the Court in the present case. Yet even in the absence of any such binding effect (a question discussed more fully in Part IV, infra) we should carefully consider on its merits the argument that convinced the Court in Reid.

The nub of the argument is that the words appearing to adjudicate the question of ownership ("is the property of the widow of Puailoa") were modified and effectively cancelled by the words immediately following ("and that she should have during her lifetime the rents"). In the opinion of the 1982 Court, the 1931 Court was hopelessly confused:

> [T]he common law legal terminology applied by a palagi [sic: papalagi] judge in Nouata came into conflict with the

> non-Western concepts of communal land and
> pule. The Nouata decision states "that
> that part of Malaeimi that is leased to
> the Mormon Missionaries is the property
> of the widow Puailoa and that she shall
> have during her lifetime the rentals."
> On its surface this holding appears to be
> confusing even the common law notions of
> the granting of a fee simple interest in
> the land and at the same time granting
> only a common law dower interest in the
> rents.

Reid, supra (Decision and Order issued April 19, 1982), at 11. In other words, the Chief Justice in 1931 is said to have been ignorant not only of Samoan customary law, but also of the Anglo-American law he is said to have been erroneously trying to apply. And it gets worse:

> The Nouata decision then only further confuses
> the issue by going on to give to Salataima
> some power over the rentals upon her death, if
> the lease was still running.

Id. at 12. Thus finding the 1931 decision incoherent on its face, the 1982 Court proceeded to "interpret" it in light of various extrinsic factors so as to find that it "only gave to Salataima the rentals from the Church lease." Id.

But the 1931 decision is not incoherent. Indeed, the language quoted by the 1982 Court does not even appear to us, read in its entirety, to be ambiguous. There is one way, and only one, in which the operative language can be read so that each phrase has some effect and so that the whole passage makes sense:

1) The land in dispute is the property of Salataima.

2) As the owner, she is entitled to receive the rents during her lifetime; and

3) As the owner, she is also entitled to say who will receive the rents --- that is, who will become the next owner ---after she dies. She should therefore make a will.

69

4) It would be a good idea if she left the property to the Puailoa family, but this is only a suggestion.

It should be recalled that the intense interest in who owned this particular 360 acres was because it was rented out. There was at that time (as contemporary records generally attest and as the 1931 Court expressly found) plenty of land available for occupation and cultivation; but not much of it was rented to wealthy corporate tenants. That the Court, having declared Salataima the owner, should go on to say where the rental payments would go --- to the owner during her lifetime, and to whomever she designated after her death --- makes perfect sense in the context of the case.

The 1982 Court's alternative interpretation, in contrast, discards and then negates about three-fourths of what would otherwise appear to be the 1931 Court's holding. Not only is the land in question not "the property of" Salataima, but it would be pointless for her to leave a will saying "who she wants this money to go to after her death," for the devolution upon the Puailoa family after her death is not "only a suggestion."

The more straightforward interpretation of the 1931 holding has the added advantage of not making it necessary to conclude that the Court was ignorant either of Anglo-American law or of Samoan custom. It is true, as the 1982 Court points out, that Western concepts such as "fee simple" and "dower right" were not invariably useful in describing Samoan land tenure. But these terms were not used by the 1931 Court; rather, they were introduced by the 1982 Court itself in the course of explaining how the earlier court must have been confused. Although the Samoan word pule does mean some things other than the English word "ownership," and may therefore give rise to confusion, it is no more evident that the 1931 Court was the victim of such confusion than that the 1982 Court was.

The simplest explanation for the 1931 Court's decision is that it believed Salataima's testimony: that her husband Vaiuli went to Apia and "won" the land from the McArthur company before he became Puailoa, and that he had always been recognized within the family as having the right to do with

70

this land and its proceeds as he wished. While this testimony might not have required the conclusion that Malaeimi belonged to Puailoa Vaiuli in his capacity as Vaiuli rather than as Puailoa, it was certainly sufficient to support such a conclusion. The testimony of one other witness, Fanene, was to the effect that all lands owned by Puailoa Vaiuli were his own lands rather than Puailoa family lands. Only Nouata testified to the contrary. Even taking into account the presumption that land is communal rather than individual, the Court's decision appears to have been well supported by the evidence.

The 1982 Court, without directly addressing the possibility that the Court simply believed Salataima, discounts it by finding that her testimony had been "self-serving," as it clearly was and as testimony in land cases tends to be. The 1982 Court draws the further unwarranted inference that the 1931 Court "saw through this [i.e., Salataima's testimony]" since "otherwise it would have awarded the entire Malaeimi lands to her" instead of recognizing the claim of the Puailoa family to that portion of Malaeimi not leased by the Church. Reid, supra, at 12. Here the 1982 Court overlooks the testimony itself. Salataima did testify that Vaiuli won all of Malaeimi for himself, but not that he left all of Malaeimi to her. She said only that he left her the land that was leased to the Church. If the remainder of Malaeimi was Vaiuli's individual property he had the right to leave it to the Puailoa family if he wanted to, and on cross-examination Salataima appears to have acquiesced to the proposition that he did so. Nouata v. Pasene, LT No. 18-1930 (Transcript of trial held June 9, 1931) (testimony of Salataima). Thus the most obvious reading of the 1931 Court's opinion is in no way inconsistent with the record before it.

In construing the ostensibly ambiguous 1931 decision the 1982 Court relied heavily on its reading of the decisions and of the records of three other proceedings: the 1905 lease controversy discussed in paragraph 2 of section I, supra, which the Court assumes to have been a judicial proceeding although there is no record of it and although it may well have been an informal hearing before an administrative official; Alo Taisi v. Puailoa, 1 A.S.R. 194 (1909), discussed in paragraph 4 of section I, supra; and Tu'utau v.

<u>Fanene</u>, No. 1-1931, discussed in paragraph 12 of section I, <u>supra</u>.

It is true that both the 1909 and the 1932 decisions speak, albeit in passing, of part of Malaeimi as the land of "the name Puailoa." It is also true that Puailoa Vaiuli's testimony in the record of the 1909 case would have supported a finding that he had gone to Apia to regain land for the Puailoa family rather than to gain it for himself. Neither of these cases, however, involved a dispute about the question that was directly confronted in 1931 and that directly confronts us in the present case: whether Malaeimi, or any part of it, was individual or communal land.

The 1909 case was a dispute between Puailoa Vaiuli and a chief of another village who clearly did not own the land. Puailoa Vaiuli stressed both the historic claims of his ancestors to Malaeimi (which is said to have been the site of a long-abandoned village of which Fanene and/or Puailoa may long ago have been the principal matais) and his role and that of his father in winning the land in Apia. <u>See</u> <u>Alo v. Puailoa</u>, LT No. 4-1908, Transcript of Proceeding held June 9, 1909 (<u>Nouata</u>, 1978 Motion to Reopen, Puailoa Exhibit 1), testimony of Puailoa. The statement by the 1909 Court that part of Malaeimi belonged to "the name Puailoa," even in the unlikely event it was intended to resolve any future controversy with the individual heirs or devisees of Vaiuli, was <u>obiter dictum</u> and was not binding on the 1931 Court.

The 1932 decision, written by the same Chief Justice Wood who was the author of the 1931 decision, is more interesting in that it does seem to say that part of Malaeimi belongs to "the name Puailoa," that the rental of some of that part is received by Salataima, and that the remainder is "under the pule" of Puailoa Nouata. <u>Tu'utau v. Fanene</u>, <u>supra</u>. Again, however, the case did not concern the question for which it has been cited. <u>Tu'utau</u> was a case between Fanene and a member of the Puailoa family over a tract other than that involved in the 1931 case and in the present case; any reference to the previous decision, or to who owned the 360 acres across the road, was dictum.

Dictum is not regarded as binding in subsequent cases because of the presumption that a judge will have a more thoughtful reaction to a

72

question when his attention is fully engaged by it and all the facts are before him than when they are not. To the extent that Chief Justice Wood's passing remark in 1932 differs from his holding in 1931, it may be because he expressed himself more carefully on one occasion than on the other; the law presumes that the more careful expression was in the holding itself. Or it may be that by 1932 he had forgotten the precise details of the 1931 case, or thought better of the matter. In any case we are bound by the 1931 holding and not the 1932 dictum. Moreover, we note that on at least two occasions after the 1931 holding --- in his letters to the Governor of October 24 and November 30, 1931 --- Chief Justice Wood spoke of his decision as having involved the "ownership" of the land in question. Nouata, 1978 Motion to Reopen, Puailoa Exhibits 12 and 19, discussed in paragraph 10 of part I, supra.

Any general canvass of judicial statements concerning Malaeimi must also take account of Chief Justice Morrow's dictum in 1953 that the land leased to the Church was "individually owned by a Samoan [i.e., Salataima]." In re Airport at Tafuna, quoted and discussed in paragraph 16 of section I, supra.

The main point, however, is that the Nouata decision speaks at least as well for itself as any earlier or later statement can speak for it. In our view, the unambiguous holding that the 360 acres was "the property of" Salataima is reinforced rather than rendered ambiguous by the Court's additional comments and recommendations regarding disposition of the rentals before and after Salataima's death. We are bound by this decision whether or not we agree with it.

Accordingly, we hold that Salataima was the owner of the sixty acres presently in dispute; that upon her death the land devolved upon Lagafuaina Laisene; and that plaintiff Puailoa has no right to any relief against the present defendants.

## III. Adverse Possession

Even if Salataima did not own the sixty acres in 1931, we would hold that Lagafuaina Laisene and his devisees had acquired them by adverse possession before this suit was filed.

Salataima was neither a blood member of the Puailoa family nor, after her husband's death and the events of 1931, analogous to a member of the family in any way that would prevent her possession of the sixty acres from being clearly hostile to the Puailoa claim. Her adverse possession of the sixty acres almost certainly began no later than 1931, when it had become clear (painfully so to the Puailoas) that she exercised authority over the land in her own right and not as a permittee of the Puailoa family. Her possession of the land from that date, albeit through a tenant, was as open, as notorious, and as hostile as possession can ever be. Even if occupation through the Church as tenant were somehow inadequate, the exclusive occupation by Salataima herself, her brother Lagafuaina, and other members of the Lagafuaina family after 1953 would have been more than sufficient to constitute adverse possession.

Under the twenty-year adverse possession statute then in force, Lagafuaina and his devisees would have acquired the sixty acres by 1973. The claim filed by Puailoa in the Lagafuaina probate proceeding in 1975 was the first arguable interference with possession by Lagafuaina. Since this claim was soon withdrawn, it is more likely that the filing of the motion for new trial in Nouata in 1978 was the first such interference.

By then it had been at least twenty-five years, and probably forty-seven years, since the adverse possession began.

We respectfully disagree with the dictum in the appellate decision in Reid to the effect that an individual can never acquire communal land by adverse possession. See Reid, supra, 1 A.S.R.2d at 88-89 n.1. Contrary to the view therein stated, we believe that the circumstances under which land is acquired by adverse possession are so different from those attendant to the ordinary alienation of land that the Fono cannot be presumed to have regarded adverse possession as a "sale, gift, exchange, or other method of disposal of property" to which the racial restrictions and other procedures governing alienation of communal property apply. A.S.C.A. § 37.0201. We note that adverse possession is provided for in the chapter on "Titles to Land" rather than in the separate chapter on "Alienation of Land" containing the aforementioned restrictions and procedures.

A.S.C.A. § 37.0120; 37.0201 et seq. Finally, we note that the jurisprudence of the High Court has long recognized that an individual can acquire communal land by adverse possession. See, e.g., Sione v. Tiualii, 3 A.S.R. 66 (1953); Lolo v. Heirs of Sekio, 4 A.S.R. 477 (1964).

This question was apparently neither briefed nor argued by any party to Reid, and the Court's statement was not necessary to its holding. If an appeal should be taken from the present decision, and if the appellate court should find it necessary to reach the question of adverse possession, we would suggest that the parties and the Court give plenary consideration to whether the correct rule is stated by the dictum of Reid or by the earlier rule of Sione and Lolo.

Finally, we note that the primary grounds on which the Reid Court held that the Church had not acquired the 300 acres at issue in that case by adverse possession are inapplicable here. The holding of the appellate decision in Reid was that the Church had not begun its adverse possession until 1953 and therefore, under the thirty-year adverse possession statute, had not acquired title by the time suit was filed in 1979. 1 A.S.R.2d at 88.

The adverse possession was held not to have begun until the sale to the Church in 1953 because of a finding of fact ---- that Salataima was a member of the Puailoa family --- which may have been consistent with the evidence before the Court in Reid, but which is clearly contrary to the evidence in the present litigation. See id., 1 A.S.R.2d at 88; compare paragraph 11 of section I, supra. In any case, on motion for relief from the judgment the Church pointed out that the twenty year adverse possession statute, not the thirty year statute, was in force during the period in question. This rendered it irrelevant whether Salataima was a family member, since even if the period of possession did not begin until 1953 title would have been acquired by 1973. The Court then held (a) that a foreign corporation could acquire land only in certain ways prescribed by statute, not including adverse possession; and (b) that in any case the possession of the 300 acres by the Church might not have been exclusive, since the Puailoas may have interfered with it in various

ways.  <u>Reid v. Puailoa</u>, AP No. 14-82 (Order issued December 11, 1984) at 6, 7.

Neither of these factors was present in the case before us.  Lagafuaina Laisene was not a foreign corporation, and the Puailoas did not interfere with his possession or that of his devisees at any time between 1953 and 1978.

## IV.  The Effect of Reid v. Puailoa

We have taken a different view than the trial court took in <u>Reid v. Puailoa</u> upon the two principal questions presented in that case and in this one.  It is appropriate to ask, particularly in light of the affirmance of <u>Reid</u> on appeal, whether that decision should be regarded as a precedent that binds us regardless of our own view on the merits of the case before us.

We have already stated that <u>Reid</u> does not have the effect of res judicata on the present case. Res judicata applies only where the parties and the subject matter of the earlier case are identical to those of the case at hand.  In this case one of the parties was a party to <u>Reid</u>, but the parties who count --- the ones who would automatically lose if res judicata were applied --were not parties to the earlier case and were not represented by an ancestor in title.  Nor is the subject matter exactly the same; that case involved the 300 acres that Salataima sold to the Church, this one involves the sixty acres she left to her brother.

The doctrine of collateral estoppel sometimes bars relitigation of issues even where the facts or the parties are somewhat different in the new case than in the old.  The estoppel can apply, however, only against a party who was represented in the earlier litigation.  If Puailoa had litigated against the Church and lost, he might have thereby been estopped from bringing essentially the same case against the present defendants.  Having won, however, he is not automatically entitled to a similar judgment against people who were not parties to the earlier litigation and who are not successors in interest of anybody who was.  The doctrine of collateral estoppel does not apply here.

The only doctrine that might bind us to reach the same result as <u>Reid</u> is stare decisis.  This is

76

a far broader doctrine than res judicata or collateral estoppel: it often effectively dictates the result in cases whose facts and parties have little or nothing to do with those of the precedent. Stare decisis, however, applies to questions of law and not of fact, to general propositions rather than to specific inquiries.

It often happens that more than one lawsuit arises from a single event or chain of events. Almost inevitably the first case litigated involves the decision of some question or questions of law, and more often than not the law and the facts are intertwined so as to make it technically possible to argue that stare decisis applies even though res judicata and collateral estoppel do not. Even in cases involving such "mixed questions of law and fact," however, courts preclude relitigation only by parties who have already litigated the question or who had a fair chance to do so in the first lawsuit. See generally <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322 (1979).

Our disagreement with the trial court in <u>Reid</u> is not about general propositions of law but about the application of those principles to a particular fact situation. The principal question on which we disagree concerns the interpretation of yet another judicial decision --- specifically, whether <u>Nouata</u> dealt with the question of title to the 360 acres. This can fairly be called a mixed question of fact and law. But in the present case and in <u>Reid</u> this question of interpretation operates more as fact than as law: it is more like the question whether A and B have a contract than whether contracts are binding without consideration. It is the sort of question whose relitigation should be barred or not according to the rules of res judicata and collateral estoppel rather than those of stare decisis.

We do not disagree with the <u>Reid</u> Court about whether one case adjudicating a question bars relitigation of the same question between the same parties, but only about whether <u>Nouata</u> did in fact adjudicate the question of who owned the 360 acres. Indeed, we do not even disagree about canons of interpretation --for instance, about whether ambiguous language should be construed by reference to extraneous sources ---- but about whether the words "the property of the widow of Puailoa" are, in a particular context, ambiguous.

77

That strangers to a lawsuit should be bound by the court's construction of language in a document on which their claim is based, even though they had no chance to present their own arguments and evidence to the court, is precisely what the limits of res judicata and collateral estoppel are calculated to avoid. That the document in question is an ancient court decision --- a decision stating no doctrine, of no more importance to anyone outside the case than an identically worded and equally ancient will or deed --- does not justify the erosion of these limits. This is not what stare decisis is about. See Swilley v. McCain, 374 S.W.2d 871 (Tex. 1964)

Our analysis is consistent, we believe, with that applied by the Appellate Division in Reid. The appellate court did not treat the trial court's interpretation of Nouata as a question of law but as a question of fact. See Reid v. Puailoa, AP No. 14-82, Opinion rendered March 30, 1983, at 7, discussed in paragraph 28 of part I, supra. The extremely deferential "clearly erroneous" standard of review was therefore applied, and the trial court's interpretation was found not to be without some support in the evidence. Id. There is no inconsistency between this result and a different determination of the same question in a later lawsuit involving a party who is not bound by the decision in Reid.

Indeed, the Appellate Division, even while affirming the trial court decision in Reid as against the appellee in that case, specifically held that the present defendants were not bound by the result. The trial court's attempt to "affect the rights of individuals who were not parties to the litigation" without "granting them an opportunity to defend their interests" was held to have violated "[e]lementary concepts of due process." 1 A.S.R.2d at 89.

It was because the Appellate Division held the trial court's judgment not binding with regard to the sixty acres presently in dispute that Puailoa found it necessary to institute the present lawsuit. We feel sure that in guaranteeing the present defendants an "opportunity to defend their interests" the Appellate Division had something in mind other than the mechanical imposition of the very holding whose application to these defendants

78

in the first instance violated "elementary concepts of due process." Surely it must have been contemplated not only that the defendants would get a day in court, but also that they might conceivably win.

## V. Laches and Other Equitable Defenses

If the defendants had not acquired title through Salataima or by adverse possession, the doctrine of laches would apply to limit Puailoa's recovery. About fifty-two years elapsed between the last occasion on which we have any evidence that Puailoa Nouata protested the Nouata decision and the filing of the present suit. Four more years elapsed before most of the present parties were named as defendants. In the meantime, and particularly during the years between 1960 and 1987, innocent third parties bought land, built homes, and raised families on the land. We have no evidence that any of the purchasers knew of the Puailoa claim at the time they built their improvements. Puailoa, on the other hand, did know the identities of at least some of the purchasers, contrary to his assertion at the time he filed suit in 1983. According to the testimony of Puailoa's daughter who was his principal witness at trial, these people were left more or less alone for several years because it had been decided for strategic reasons to go after the Church first and the individual owners later.

Even in the absence of circumstances giving rise to laches, those who built improvements prior to 1987 would appear to be good-faith improvers with a right to compensation upon eviction. See Roberts v. Sesepasara, 8 A.S.R.2d 124 (1988).

In light of our decision on the merits it is not necessary to calculate the amount that would be necessary to compensate those who purchased land and/or built improvements in the event they were evicted by Puailoa. This issue can be addressed, preferably after a further evidentiary hearing, in the event an appeal should be taken and the appellate court should reverse and remand.

## VI. Order

Since plaintiffs have not carried their burden of proving that they own the land presently in

dispute, judgment is entered for the defendants and the action is dismissed with prejudice.

It is so ordered.